

**IN THE UNITED STATES DISTRICT COURT**
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

JAN 1 6 2026

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

| | | |
|---|---|---|
| JOHN HURT,<br>   Plaintiff, | §<br>§<br>§ | |
| v. | § | CIVIL ACTION NO. _4:26 cv 75 ALM/BD_ |
| | § | |
| HILLTOP HOLDINGS, INC.,<br>   Defendant | §<br>§<br>§ | |

JURY TRIAL DEMANDED

## PLAINTIFF'S COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff John Hurt, appearing pro se, files this Complaint. Plaintiff respectfully alleges:

## I. INTRODUCTION

1. Plaintiff John Hurt is an experienced, certified professional specializing in audit, regulatory compliance, and Sarbanes-Oxley (SOX) controls, with over 20 years in executive roles at major financial institutions. Plaintiff was recruited to Hilltop Holdings Inc., a publicly traded financial services company headquartered in Dallas, Texas, for his expertise in SOX compliance and risk management

2. Plaintiff joined Hilltop Holdings Inc. in October 2023 as a senior risk and compliance professional, initially reporting to Manager Matt Magusiek. Plaintiff initially worked alongside other senior compliance personnel before being placed under a different supervisory structure.

3. During his tenure, Plaintiff was subjected to a pattern of harassment, retaliation, and discriminatory treatment based on age and disability by Hilltop Holdings, Inc., acting through

1

its supervisors, managers, and Human Resources personnel, with full knowledge of Plaintiff's protected status and complaints.

4. Plaintiff suffers from documented medical conditions, including severe IBS, monocular vision, and incurable cancer requiring ongoing chemotherapy.

5. Despite being medically cleared to continue working remotely during treatment, Defendant Hilltop Holdings, Inc. forced Plaintiff onto unpaid FMLA leave without justification and refused to engage in the ADA-required interactive process.

6. Following protected activity, Plaintiff experienced escalating retaliation, including increased scrutiny, condescending remarks (e.g., "Bud"), exclusion from meetings, public mockery of his work methods, isolation, and unjustified monitoring of emails and internal communications all undertaken by or at the direction of Hilltop through its management and HR representatives.

7. Hilltop's Human Resources personnel failed to intervene despite receiving clear notice that Plaintiff's chemotherapy could be interrupted without reasonable accommodation and instead participated in or authorized monitoring of Plaintiff's workplace communications.

8. This surveillance was undertaken by Hilltop, acting through Human Resources, management, and/or information-technology personnel, and was not routine or neutrally applied. This conduct was both objectively hostile and subjectively humiliating, meeting the threshold for actionable harassment: "[T]he conduct must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive."

9. Plaintiff asserts claims under the ADA, ADEA, SOX, the Texas Labor Code, and Texas common law, including gross negligence, intentional infliction of emotional distress, intrusion upon seclusion, and requests for declaratory and injunctive relief. These claims

arise from a continuing pattern of discrimination, harassment, medical privacy violations, and retaliation by Defendant Hilltop Holdings acting through its supervisors, managers, and Human Resources personnel.

## II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the ADA, ADEA, and SOX. The Court also has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367(a). Venue is proper in the Eastern District of Texas, Sherman Division, under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District.

11. Plaintiff was employed in and the relevant conduct took place within Collin County, Texas, which is within the Sherman Division of the Eastern District of Texas.

12. Plaintiff filed charges with the EEOC and the TWC Civil Rights Division and has satisfied administrative prerequisites to the extent required for the claims asserted.

## III. PARTIES

13. Plaintiff John Hurt is an individual residing in Collin County, Texas. He is a former employee of Hilltop Holdings Inc. and appears in this action pro se.

14. Defendant Hilltop Holdings Inc. is a publicly traded financial services holding company headquartered in Dallas, Texas. Hilltop may be served through its registered agent for service of process or through counsel of record,

## IV. FACTUAL ALLEGATIONS

15. Plaintiff is a highly credentialed and respected professional (CPA, CIA, CFA, CRCM) with over 20 years of experience in audit, finance, and compliance. He joined Hilltop Holdings in October 2023.

3

16. Plaintiff was recruited for his expertise in SOX documentation and control testing, including experience developing, reviewing, and remediating controls in response to regulatory findings. His role was intended to strengthen Hilltop Holdings Inc.'s internal controls and compliance posture

17. Plaintiff initially reported to Manager Matt Magusiek, at which time he worked alongside other senior compliance personnel. Plaintiff was subsequently reassigned to report directly to a Hilltop Supervisor, who became his immediate supervisor and exercised authority over his assignments and performance reviews.

18. In or about May 2024, following the change in reporting, Plaintiff began experiencing a pattern of age- and disability-related mistreatment by Hilltop, acting through its supervisory personnel.

19. In late 2024, Plaintiff's Hilltop supervisor  issued Plaintiff a generic set of last-minute "development goals" without prior discussion, alignment, timeline, or support. These included vague directives such as "attend advanced training" or "gain proficiency in Tableau," unrelated to Plaintiff's role. This superficial exercise was later used to justify criticism and discipline, contributing to a retaliatory and hostile environment.

20. These non-specific goals were subsequently cited as pretextual grounds for discipline in February 2025.

21. In response to the February 2025 performance review delivered by Hilltop management, Plaintiff submitted a written rebuttal noting that the review was a point-by-point critique of his self-evaluation without constructive feedback. He documented that goals were imposed without discussion, training was denied, and criticisms misrepresented facts. Plaintiff's written objections demonstrate retaliatory motive and a hostile work environment.

22. On April 2, 2025, Hilltop issued Plaintiff a formal written counseling record labeled as a "final warning." This document cataloged alleged performance failures but disregarded Plaintiff's repeated requests for training, reasonable accommodation, and HR intervention. The memo relied on disputed criticisms that escalated only after Plaintiff began requesting medical accommodation and reporting retaliation.

23. Shortly thereafter, Plaintiff received a call from **a** Hilltop Human Resources representative inquiring, "Are you really happy here?" Mandrell then began to discuss options with Plaintiff and noted that, "we know you're actively job hunting, we see you on LinkedIn"

24. One of Plaintiff's initial responsibilities was participation in the quarterly Sarbanes-Oxley (SOX) certification process.

25. At all relevant times, the acts and omissions described herein were undertaken by Hilltop Holdings, Inc. through its supervisors, managers, Human Resources personnel, and other agents acting within the course and scope of their employment, and/or were authorized, ratified, or knowingly tolerated by Hilltop after notice of Plaintiff's complaints and accommodation requests.

### SOX CONTROL FAILURES AND PROTECTED ACTIVITY

26. Plaintiff had operated at the Vice President level or above since June 2004, consulting on, developing, and auditing SOX compliance processes.

27. Plaintiff identified and voiced concerns that the SOX certification process was overly simplistic and did not comply with applicable regulations.

28. Among the issues was that several control owners did not understand what they were certifying or why.

29. Each quarter required multiple revisions to control descriptions, process narratives, and flow charts in the SAI repository, due to the absence of effective monitoring and change management processes.

30. Plaintiff continued raising these concerns during each quarterly certification, advocating for a more rigorous and compliant approach throughout his tenure.

31. Plaintiff reasonably believed, and in fact identified, deficiencies in internal controls over financial reporting that could result in materially misleading certifications and public disclosures, conduct protected under 18 U.S.C. § 1514A.

32. These concerns were confirmed during the 2025 annual control refresh exercise, an assignment for which Plaintiff was criticized and which contributed to his inability to continue reporting to work.

33. The refresh exercise uncovered numerous known and unknown issues with control descriptions, owners, and participants, indicating that key personnel often did not know which controls they were responsible for, demonstrating the continuation of a process that had been broken for at least six years.

34. Plaintiff preserved evidence of systemic SOX documentation failures ignored by Hilltop. For example,  an admission by a control owner that they had not performed the control "for a number of years" and identified another employee as the actual owner. This supports Plaintiff's contention that SOX documentation errors were systemic and beyond his control.

35. Plaintiff's concerns about the SOX control environment were validated by the findings of the 2025 control refresh exercise. Specifically, the updated Control Owner Attestation Report identified multiple high-risk SOX controls with inaccurate or outdated owners, participants, or descriptions. For example:

6

36. The control responsible for BancWare ALM model assumptions (a key Treasury control) was assigned to the wrong owner and had misidentified the process owner.

37. A quarterly HTH IT GRC reconciliation control was marked as inaccurate and noted that the control owner could not access required systems.

38. Several controls involving daily financial transaction reviews (Check Services, Deposit Support) had incorrect ownership or documentation.

39. Plaintiff had previously raised these and similar concerns, particularly about lack of training, unclear ownership, and the falsification of quarterly certifications. These findings provide further evidence that Plaintiff's protected activity was both warranted and accurate, and that retaliation followed his efforts to expose these material weaknesses, including heightened scrutiny, adverse performance actions, and ultimately his inability to continue working.

40. During his work on SOX control documentation, Plaintiff identified and documented internal inconsistencies in key controls. For example, official system entries for two key controls contained conflicting statements about control execution frequency in the description field versus the frequency field. These errors were not unusual at Hilltop and were symptomatic of broader failures to maintain SOX documentation accurately.

41. This issue was also prominent in the "IBS Topology Update Project" Plaintiff was assigned to at the end of 2024.

42. This project made it very clear that process and control owners were not properly aware of the methods by which their processes were feeding data to the company's primary accounting system, IBS.

43. Between November 26, 2024, and December 24, 2024, Plaintiff was assigned to work with executive business stakeholders to document the retirement of the A3 system. Despite being

told it was retired, Plaintiff discovered one department was still using the system and that it had effectively been abandoned since 2020 or 2021.

44. Emails with Executive Mark Arvizu confirm the misleading scope and chaotic nature of this project. This assignment exemplifies Hilltop's practice of assigning unclear, politically fraught work without support or training, then blaming Plaintiff for resulting issues.

## AGE-RELATED HARASSMENT AND HR FAILURES

45. **Plaintiff's Hilltop supervisor**, openly mocked Plaintiff's use of paper notes during meetings, implying cognitive decline associated with Plaintiff's age. These comments were made in front of colleagues and contributed to a hostile work environment that exacerbated Plaintiff's anxiety. Plaintiff reported this conduct to Hilltop Human Resources as distressing and discriminatory, but no corrective action was taken.

46. Despite Plaintiff notifying Hilltop Human Resources that this conduct was humiliating and harmful, no corrective measures were implemented. Instead, Plaintiff's work was subjected to increased and unwarranted scrutiny.

47. In August 2024, Plaintiff reported to **a second-level Hilltop manager** that **his immediate supervisor** was assigning him menial tasks inconsistent with his senior role and deliberately delaying review of substantive assignments.

48. Plaintiff documented direct communications with his supervisor showing pretextual blame for alleged delays in completing review notes. Microsoft Teams chats reflect Plaintiff's supervisor claiming Plaintiff had not responded to September 5 notes, despite Plaintiff completing them promptly and saving them to the shared drive. The exchange shows Plaintiff's supervisor admitting he may have overlooked the communication and apologizing, undermining the validity of later disciplinary action.

49. In October 2024, Plaintiff participated in a second formal discussion with Hilltop Management regarding ongoing discrimination, harassment, and failures in the accommodation process. Plaintiff raised concerns about HR's dismissive approach, unclear work instructions, lack of training on assignments such as RLN 41 and the payroll project, and Plaintiff supervisor's delay in reviewing the RLS narrative that had been pending since early August. Plaintiff documented being publicly blamed for these delays in team meetings and Teams chats despite repeatedly seeking direction and feedback.

50. Plaintiff engaged in repeated, documented communications with Hilltop Human Resources regarding his medical conditions and requests for reasonable accommodation over an extended period. These communications placed Defendant on clear notice of Plaintiff's disabilities, his accommodation needs, and the ongoing failure to engage in a meaningful interactive process.

51. Following a November 2024 team meeting where Plaintiff's supervisor belittled Plaintiff for allegedly "late" work on the Mortgage Loan Servicing project, which had been ready for review for weeks, Plaintiff raised concerns in an email that this treatment was discriminatory and undermined his ability to contribute meaningfully despite his qualifications. A Hilltop manager dismissed these concerns as "a distraction".

52. As a result of Plaintiff's supervisor's inaction, Plaintiff sent a Microsoft Teams message to his supervisor asking whether the Mortgage Loan Servicing narrative and process flow updates had been reviewed.

53. Plaintiff's Supervisor replied, "I didn't get the email," feigning ignorance of a project he had known about for weeks.

54. He, in a moment of exasperation at Plaintiff's supervisor's repeated attempts to shift blame, responded with the remark, "Are you kidding me?"

55. The supervisor escalated the matter to Hilltop Human Resources, where no investigation was conducted and Plaintiff was instead berated in a loud and unprofessional manner, further evidencing Human Resources' role in enabling and ratifying discriminatory conduct.

### FAILURE TO ENGAGE IN ADA INTERACTIVE PROCESS

56. This was the first of multiple occasions on which Hilltop Holdings, Inc., acting through Human Resources personnel, failed to properly investigate Plaintiff's complaints of harassment and discrimination.

57. During Plaintiff's initial interactive discussion with Hilltop Human Resources representatives, statements were made reflecting a fundamental misunderstanding of the ADA. They asserted that Irritable Bowel Syndrome was not covered by the ADA, that commuting limitations were not a covered condition, and suggested merely moving Plaintiff's desk closer to a bathroom.

58. These statements were medically and legally inaccurate and demonstrated Hilltop's failure to engage in a good-faith discussion of reasonable accommodations as required under federal and state law.

59. On November 7, 2024, Plaintiff submitted a second doctor's letter explicitly confirming his cancer diagnosis and need for accommodation. This letter was provided after repeated requests dating back to August 2024 that went unaddressed. Despite clear notice of Plaintiff's condition, Hilltop Human Resources later claimed they "just found out" about his cancer when forcing him onto FMLA leave, illustrating indifference, pretext, and a breakdown of the interactive process.

60. On June 9, 2025, Plaintiff submitted a formal written notification to Hilltop Human Resources explaining that his recent absences were directly attributable to the cumulative impact of workplace harassment and retaliation. Plaintiff documented the significant toll on his physical and mental health, reaffirmed his good-faith belief that the conduct was unlawful, and specifically requested that no adverse action be taken in retaliation for asserting his rights. He also reiterated his willingness to discuss reasonable accommodations to remain employed in a safe and productive manner. Despite this notice, Hilltop escalated disciplinary measures and forced Plaintiff onto unpaid leave without meaningful engagement.

## DENIAL OF REASONABLE ACCOMMODATION

61. In August 2024, Plaintiff met individually with Hilltop Holdings, Inc., acting through supervisory personnel to discuss his medical needs and inability to commute due to worsening symptoms from incurable cancer and severe IBS.

62. In December 2024, Plaintiff informed Hilltop management that he lacked prior experience with SBA loans or the SOX processes in question and requested support. Management acknowledged Plaintiff's lack of experience  but provided no meaningful onboarding or training.

63. Plaintiff requested accommodation but was informed that Hilltop Human Resources considered his condition "temporary," based solely on the brevity of a doctor's note. Hilltop never engaged in the ADA-required interactive process; see also *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999) ("The ADA envisions an interactive process that requires participation by both parties.").

11

64. In addition to his explicit request to work remotely, Plaintiff's documented conditions, including monocular vision, cognitive fatigue, and treatment-related physical decline, were well known to Hilltop and its agents.

65. Under the ADA and Texas Labor Code, these circumstances triggered Hilltop's duty to explore a range of reasonable accommodations through a good-faith interactive process. However, Hilltop never initiated such a process and made no effort to evaluate or propose any accommodation beyond improperly forcing Plaintiff onto FMLA leave. Hilltop's failure to consider modified tasks, flexible hours, or ergonomic or visual aids constitutes a violation of their legal obligations to accommodate known limitations, not merely the specific accommodations identified by the employee.

66. Hilltop did not consider any alternative accommodations despite their awareness of Plaintiff's functional limitations. "[A]n employer cannot shield itself from liability by choosing not to engage in the interactive process or by placing the burden on the employee alone." This failure constitutes a direct violation of Hilltop's legal obligations under the ADA and Texas Labor Code. (See *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).)

67. As Plaintiff's treatment progressed, he requested permission to work remotely during chemotherapy, including from the hospital. He had previously worked remotely numerous times, including from hotels with his supervisor's knowledge and consent, without issue, and had successfully led multiple documented high-impact projects.

68. In a written communication to Hilltop Human Resources, Plaintiff warned that without continued income he would be forced to discontinue chemotherapy due to its $95,000

monthly cost. Hilltop did not respond. This was a foreseeable, extreme harm that Hilltop chose to disregard.

69. Hilltop's published Remote Access Standard, Information Security Handbook, and Code of Ethics all permit and encourage secure offsite work. Plaintiff had full access to systems such as VPN, Microsoft Teams, and virtual desktops, and was fully capable of performing his duties securely. Nevertheless, despite multiple prior approvals for remote work, Hilltop denied his request to work remotely during active treatment and required him to exhaust all accrued Paid Time Off (PTO).

## RETALIATORY FORCED FMLA LEAVE AND CONSTRUCTIVE DISCHARGE

70. Plaintiff offered to discuss his disabilities and reiterated his willingness to continue supporting the team. Hilltop Holdings, Inc., through Human Resources and supervisory personnel, did not respond.

71. On June 10, 2025, Plaintiff submitted a formal written request for medical accommodation, invoking protections under the ADA. He noted that his monocular vision and related impairments had long been known to Hilltop and that paperwork was not legally required under the ADA for obvious or previously disclosed disabilities.

72. On June 12, 2025, Plaintiff sent another email stating: "As of today, I have not received confirmation of accommodation or responses to my other requests under the ADA. *I request again your attention to this legally required matter. I want and need to be able to work.*"

73. These communications demonstrate Plaintiff's continuous, good-faith attempts to engage in the ADA-required interactive process and underscore Hilltop's deliberate failure to respond, which directly preceded the decision to force Plaintiff onto unpaid medical leave and effectively remove him from the workplace.

74. Hilltop Holdings, Inc., acting through Human Resources and supervisory personnel, ignored Plaintiff's doctor-recommended limitations and imposed escalating discipline under false pretenses, culminating in a written "counseling memo" dated April 2, 2025. The memo cited incidents from March 2025 and referenced two purported "verbal warnings" allegedly given on October 11, 2024, and January 10, 2025, neither of which actually occurred.

75. During this period, Plaintiff was increasingly assigned only menial editing and process-narrative tasks that were below the level of his senior compliance role and unrelated to his SOX expertise. These assignments reflect Hilltop's deliberate marginalization and isolation of Plaintiff following his requests for accommodation and reports of harassment.

76. Plaintiff filed formal discrimination complaints with the Texas Workforce Commission and the Equal Employment Opportunity Commission, alleging age discrimination, disability discrimination, retaliation, and hostile work environment. These filings constitute protected activity under federal and state law and reflect Plaintiff's good-faith efforts to seek relief through appropriate administrative channels.

77. Plaintiff subsequently filed a second formal discrimination complaint with the Texas Workforce Commission Civil Rights Division after Hilltop continued its pattern of harassment, retaliation, and refusal to accommodate. This second filing further documents Plaintiff's protected activity and Hilltop's notice of the alleged misconduct.

78. Plaintiff received official confirmation from the Texas Workforce Commission Civil Rights Division that his signed Charge of Discrimination had been accepted and filed, evidencing his continued pursuit of administrative remedies.

79. Despite this protected activity, Hilltop issued a performance review on February 28, 2025 that relied on the same nonexistent verbal warnings, failed to acknowledge Plaintiff's

14

medical limitations, and was issued only after Plaintiff had repeatedly complained of discrimination and requested accommodation.

80. Plaintiff challenged the false criticisms in the performance review, including assertions that he failed to support the Project Management Office. In response, a representative of the Project Management Office confirmed that there were no issues with Plaintiff's performance on the Finzly project, undermining Hilltop's stated reasons for discipline and supporting an inference of pretext.

81. The timing and content of the April 2, 2025 counseling memo and the February 28, 2025 performance review support the inference that these documents were created to manufacture a disciplinary record in retaliation for Plaintiff's protected activity and to justify adverse action after the fact.

82. On March 1, 2025, Plaintiff formally informed Hilltop management that he believed the conduct he was experiencing constituted harassment, discrimination, and retaliation, further engaging in protected activity under the ADA, and ADEA.

83. On June 6, 2025, Plaintiff notified Human Resources that he remained seriously ill and required continued medical care, reinforcing Hilltop's contemporaneous knowledge of his deteriorating health and need for accommodation.

84. On June 10, 2025, Plaintiff submitted a formal written request for medical accommodation, expressly invoking the ADA and reiterating that his long-known monocular vision and related impairments qualified him for protection without additional documentation.

85. Rather than engage in the interactive process, Hilltop attempted to force Plaintiff onto disability or medical leave during an active phase of chemotherapy, despite his repeated and explicit requests to continue working with reasonable accommodations.

86. Although Plaintiff had previously provided medical documentation identifying his cancer diagnosis and treatment needs, Hilltop later falsely claimed it was unaware of the diagnosis until much later, further evidencing pretext and indifference.

87. Hilltop refused to engage in any meaningful interactive process or to discuss alternative accommodations, instead insisting that Plaintiff exhaust paid leave and take FMLA leave rather than remain employed with reasonable accommodation.

88. Plaintiff never requested FMLA leave and repeatedly emphasized his ability and desire to continue working. Nevertheless, Hilltop unilaterally placed him on FMLA leave without his consent, effectively removing him from the workplace.

89. This conduct constitutes a failure to provide reasonable accommodation under the ADA and Texas Labor Code and interfered with Plaintiff's protected rights and continued employment.

90. The cumulative effect of Hilltop's actions—including refusal to accommodate, escalating discipline, marginalization, and forced medical leave—rendered Plaintiff's working conditions so intolerable that a reasonable employee in his position would have felt compelled to step away, constituting constructive discharge.

## POST-COMPLAINT RETALIATION AND HOSTILE WORK ENVIRONMENT

91. Any minor errors attributed to Plaintiff were directly caused by the absence of adequate training and Hilltop's failure to accommodate Plaintiff's known medical conditions, despite his repeated requests for reasonable accommodation.

92. Following Plaintiff's formal internal complaints and ADA accommodation requests, Hilltop Holdings, Inc., acting through Human Resources and supervisory personnel, initiated targeted and non-routine monitoring of Plaintiff's Microsoft Teams activity, calendar entries, and internal email communications.

93. This monitoring was directed specifically at Plaintiff in response to his protected activity and was not applied uniformly to similarly situated employees.

94. The monitoring included real-time review of Plaintiff's communications concerning accommodation requests, health limitations, and protected disclosures. It was conducted without Plaintiff's knowledge or consent and exceeded ordinary supervisory oversight.

95. Hilltop then used information obtained through this targeted monitoring to support pretextual discipline, including backdated counseling memoranda and negative performance reviews, and to exclude Plaintiff from meetings or unfairly criticize his participation in projects he had already completed.

96. This campaign of targeted surveillance, exclusion, and manufactured discipline created an objectively hostile and intolerable work environment. Plaintiff reasonably perceived these actions as a calculated effort to intimidate him, punish him for exercising protected rights, and force his departure.

97. Hilltop was fully aware of Plaintiff's serious medical condition, including ongoing chemotherapy treatment, and knew that forced time away from work would jeopardize his ability to continue treatment. Nevertheless, Hilltop used surveillance-derived pretexts to deny accommodation, impose involuntary leave, and remove Plaintiff from active employment.

98. On or about June 3, 2025, Plaintiff's then-supervisor, Jessica Moore, instructed Plaintiff to retrieve a control report while disparaging the SAI risk and control repository, stating words to the effect of "let me know how long it takes, I hate that thing," reflecting hostility toward the very system Plaintiff was required to use.

99. Ms. Moore had previously advocated replacing the SAI system with alternative platforms, contributing to inconsistent expectations and increased pressure placed on Plaintiff despite his medical limitations.

100. The complexity of the system, the absence of meaningful training, and ongoing harassment, combined with Plaintiff's known medical conditions, including monocular vision and treatment-related cognitive fatigue—contributed to minor, correctable issues that Plaintiff promptly addressed.

101. On or about June 5, 2025, Plaintiff informed his supervisor and Human Resources in writing that the cumulative effects of harassment, surveillance, and retaliation were causing significant psychological distress and impairing his ability to safely engage with work systems.

102. The February 2025 performance review and the backdated April 2, 2025 counseling memorandum closely followed Plaintiff's protected activity, including formal complaints and accommodation requests, supporting an inference of retaliation.

103. On March 1, 2025, Plaintiff submitted written communications clarifying that his prior self-evaluation comments concerned specific documentation deficiencies necessary to complete assigned control-mapping work, not a general critique of Hilltop's SOX framework.

104. That same day, Plaintiff formally notified Hilltop management that conduct discussed in a recent meeting constituted continued harassment, discrimination, and retaliation for protected activity, in accordance with company policy and applicable administrative procedures.

105. Shortly thereafter, Hilltop issued its first formal disciplinary actions against Plaintiff, despite the absence of any documented performance issues prior to Plaintiff's protected activity.

106. The performance review relied on alleged verbal warnings Plaintiff never received and omitted any reference to Plaintiff's medical conditions or repeated accommodation requests.

107. The disciplinary record further excluded relevant context and ignored Plaintiff's successful project completions, reinforcing the inference that the discipline was pretextual and retaliatory.

108. In approximately early May 2025, Hilltop personnel accused Plaintiff of failing to contact a coworker identified only as "Brenda," without clarifying which of multiple individuals shared that name.

109. Plaintiff was confronted and pressured to immediately produce documentation for this alleged failure, despite having received no deadline or prior notice, and was interrupted when attempting to verify facts.

110. This incident exemplified Hilltop's pattern of escalating harassment over minor, non-urgent matters, deliberately creating a humiliating and hostile environment.

111. In spring 2025, Human Resources personnel contacted Plaintiff and questioned his satisfaction with his role while referencing his undisclosed job-search activity, including statements indicating awareness of private applications.

112. These comments were inherently intimidating and reasonably perceived as threatening, particularly in light of Plaintiff's ongoing complaints and medical vulnerability.

113.   Human Resources further stated that there were "options we can discuss," which Plaintiff reasonably understood as a veiled ultimatum rather than a genuine effort to provide support or accommodation.

114.   The timing and substance of these communications further support an inference of retaliation and unlawful monitoring of Plaintiff's private activity.

115.   Although Hilltop's internal policies prohibit retaliation and purport to support employees facing hardship, Hilltop departed from those policies in its treatment of Plaintiff.

116.   Hilltop's retaliatory conduct, failure to accommodate, and disregard of its own policies caused Plaintiff significant physical, emotional, and financial harm.

117.   In the weeks immediately preceding Plaintiff's forced removal from active work in June 2025, supervisory conduct toward Plaintiff became increasingly hostile and overt.

118.   Despite knowing Plaintiff was preparing to transfer to another department, supervisory personnel publicly belittled and harassed him during meetings related to critical projects.

119.   These final interactions underscored the severity and intentionality of the hostile work environment.

120.   Taken together, Hilltop's actions demonstrate a sustained pattern of retaliation and harassment that escalated after Plaintiff engaged in protected activity and sought accommodation, culminating in his constructive discharge.

121.   Hilltop Holdings, Inc., acting through its managers, supervisors, and Human Resources personnel, engaged in coordinated conduct that significantly exacerbated Plaintiff's distress and directly disrupted his ability to work and maintain his physical and emotional well-being.

122.   The actions described herein were taken by Hilltop's agents within the course and scope of their employment and with knowledge of one another's conduct, reflecting a unified

course of retaliatory and discriminatory action attributable to Hilltop under principles of respondeat superior and agency law.

123. On or about June 12, 2025, Hilltop issued Plaintiff a termination letter falsely accusing him of "stealing" documents. In reality, the materials at issue consisted of work-related records and information Plaintiff reasonably preserved in connection with documenting SOX control failures and compliance deficiencies. Hilltop's reliance on this accusation reflects retaliatory animus and the use of pretext to justify Plaintiff's removal after he engaged in protected activity.

## V. CAUSES OF ACTION

### COUNT ONE – DISABILITY DISCRIMINATION

**(Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and Texas Labor Code § 21.051)**

124. This Count is brought under both the Americans with Disabilities Act (ADA) and Chapter 21 of the Texas Labor Code.

125. Plaintiff is a qualified individual with a disability within the meaning of these statutes. His conditions, including incurable cancer, severe IBS, monocular vision, and related impairments, substantially limit one or more major life activities and were well known to Hilltop Holdings, Inc.

126. Hilltop discriminated against Plaintiff on the basis of disability by:

127. Failing to engage in the ADA-required interactive process;

128. Denying reasonable accommodations, including permitting remote work during chemotherapy;

129. Forcing Plaintiff onto involuntary medical leave despite his expressed ability and desire to work; and

21

130. Retaliating against Plaintiff for requesting accommodation through exclusion, unwarranted discipline, and constructive discharge.

131. These discriminatory actions were taken despite clear evidence that Plaintiff was able to perform the essential functions of his position with reasonable accommodation, and in direct contravention of Hilltop's own policies permitting secure remote work.

132. Hilltop's refusal to participate in a good-faith interactive process—despite repeated requests and the availability of reasonable accommodations—constitutes unlawful discrimination under the ADA and Texas Labor Code.

133. An employer violates the ADA when it fails to engage in a flexible, interactive process to identify reasonable accommodations. See *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999); *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).

134. Hilltop was repeatedly placed on notice of Plaintiff's disabilities and accommodation needs through direct communications with management and Human Resources, including written requests explaining his medical limitations, his ability to continue working, and the consequences of denying accommodation.

135. Rather than engage in the interactive process or explore reasonable accommodations, Hilltop escalated disciplinary measures, ignored Plaintiff's requests, and ultimately removed him from the workplace.

136. The temporal proximity between Plaintiff's accommodation requests and Hilltop's adverse actions supports a reasonable inference of discriminatory motive.

137. Hilltop's conduct deprived Plaintiff of equal employment opportunities because of his disabilities and caused significant economic, physical, and emotional harm.

138. Hilltop is liable for disability discrimination under the ADA and Texas Labor Code § 21.051.

## COUNT TWO – AGE DISCRIMINATION

**(Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and Texas Labor Code § 21.051)**

139. This Count is brought under the Age Discrimination in Employment Act ("ADEA") and Chapter 21 of the Texas Labor Code.

140. At all relevant times, Plaintiff was over the age of forty and therefore a member of the protected class under federal and Texas age discrimination laws.

141. Hilltop Holdings, Inc. discriminated against Plaintiff on the basis of age through a pattern of demeaning and marginalizing conduct, including repeated use of condescending terms such as "Bud," unjustified isolation, exclusion from key meetings and communications, and adverse employment actions taken after Plaintiff raised complaints regarding discrimination and accommodation.

142. Hilltop further excluded Plaintiff from critical meetings and information flows, assigned him menial tasks inconsistent with his senior qualifications and experience, withheld necessary training, and subjected his work to disproportionate scrutiny and criticism compared to similarly situated employees.

143. This discriminatory treatment began following a change in management and intensified after Plaintiff engaged in protected activity. The temporal proximity between Plaintiff's complaints and Hilltop's escalation of adverse actions supports a reasonable inference of pretext and unlawful age-based motive.

144. Hilltop's conduct created a hostile work environment and materially contributed to Plaintiff's constructive discharge. The cumulative actions were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and would have dissuaded a reasonable employee in Plaintiff's position from continuing to work.

145. Age discrimination may be established through circumstantial evidence, including age-related remarks combined with adverse employment actions and pretext. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

146. Hilltop Holdings, Inc. is liable for age discrimination under the ADEA and Texas Labor Code § 21.051.

## COUNT THREE – RETALIATION

### (ADA, ADEA, and Texas Labor Code § 21.055)

147. This Count is brought under the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and Chapter 21 of the Texas Labor Code, including § 21.055, which prohibits retaliation against employees who oppose unlawful employment practices or participate in protected proceedings.

148. Plaintiff engaged in protected activity by making internal complaints of harassment, discrimination, and failure to accommodate; requesting reasonable accommodations for known disabilities; and filing formal charges with state and federal civil rights agencies.

149. Hilltop was aware of Plaintiff's protected activity and responded by escalating adverse employment actions, including heightened scrutiny, exclusion from meetings and communications, unjustified discipline, and ultimately forcing Plaintiff onto involuntary medical leave.

150. After Plaintiff engaged in protected activity, Hilltop deliberately marginalized Plaintiff by assigning trivial or menial work inconsistent with his senior compliance role, withholding training, and disproportionately criticizing his performance.

151. Hilltop further retaliated by issuing negative performance reviews and disciplinary memoranda that relied on exaggerated or false criticisms and referenced nonexistent warnings, all of which followed closely in time after Plaintiff's protected conduct.

152. Hilltop's retaliatory actions also included refusing to engage in the ADA-required interactive process, ignoring Plaintiff's requests to continue working with accommodation, and denying him the opportunity to remain employed despite his expressed ability and willingness to work.

153. Hilltop initiated targeted, non-routine monitoring of Plaintiff's internal communications, calendar entries, and collaboration activity following his complaints and accommodation requests. This surveillance was not uniformly applied to other employees and was undertaken in response to Plaintiff's protected activity.

154. Hilltop used information obtained through this monitoring to support pretextual discipline, exclude Plaintiff from meetings, and further isolate him from his team.

155. The temporal proximity between Plaintiff's protected activity and Hilltop's adverse actions supports a reasonable inference of retaliatory motive. *See Feist v. La. Dep't of Justice*, 730 F.3d 450, 454–55 (5th Cir. 2013).

156. Hilltop's conduct would have dissuaded a reasonable employee from making or supporting a charge of discrimination and therefore constitutes actionable retaliation. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

157.    Rather than address Plaintiff's complaints in good faith, Hilltop escalated retaliation following each protected disclosure, including complaints regarding discriminatory treatment, accommodation requests, and compliance concerns.

158.    Hilltop's retaliatory actions culminated in Plaintiff's forced removal from the workplace through involuntary medical leave and termination under false pretenses.

159.    Hilltop's actions formed a continuous and escalating pattern of retaliation intended to punish Plaintiff for exercising protected rights and to deter him and others from engaging in protected activity.

160.    Hilltop Holdings, Inc. is liable for retaliation under the ADA, the ADEA, and Texas Labor Code § 21.055.

## COUNT FOUR – HOSTILE WORK ENVIRONMENT

### (ADA and Texas Labor Code § 21.051)

161.    This Count is brought under the Americans with Disabilities Act ("ADA") and Chapter 21 of the Texas Labor Code, including § 21.051.

162.    Plaintiff was subjected to a hostile work environment that was objectively severe or pervasive and subjectively humiliating, based on his disability and protected medical status.

163.    The conduct included mocking and belittling Plaintiff's work methods and medical-related limitations, patronizing language, exclusion, manufactured performance criticism, and intrusive monitoring following Plaintiff's complaints and accommodation requests.

164.    This conduct was directed at Plaintiff because of his disability and protected medical status and occurred repeatedly, including public belittling of Plaintiff's work methods, intrusive scrutiny tied to his medical limitations, and persistent patronizing language inconsistent with Plaintiff's experience and seniority.

165. Hilltop Holdings, Inc., through its management and Human Resources personnel, knew or should have known of the harassment and failed to take prompt or effective remedial action, despite Plaintiff's repeated complaints and requests for intervention.

166. A reasonable person in Plaintiff's position would have found the environment hostile, intimidating, and abusive. See *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 453 (5th Cir. 2013) (en banc); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22 (1993).

167. Hilltop's failure to respond to Plaintiff's reports of harassment and distress, combined with escalating scrutiny and exclusion, reinforced the severity and pervasiveness of the hostile work environment.

168. Hilltop's targeted monitoring of Plaintiff's internal communications and work activity following his protected complaints further contributed to a climate of intimidation and fear and materially worsened the hostile conditions of Plaintiff's employment.

169. Hilltop Holdings, Inc. is liable for maintaining a hostile work environment in violation of the ADA and Texas Labor Code § 21.051.

## COUNT FIVE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Texas Common Law – Pled in the Alternative)

170. This Count is brought under Texas common law and is pled in the alternative, in the event Plaintiff is found not to have an adequate statutory remedy or if statutory remedies are deemed insufficient to address the full scope of Hilltop Holdings, Inc.'s extreme and outrageous conduct. See *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005).

171. Hilltop engaged in a deliberate pattern of scapegoating Plaintiff for systemic SOX documentation failures that management knew predated Plaintiff's employment and refused

to correct. This conduct was calculated to humiliate Plaintiff and deflect responsibility for longstanding compliance deficiencies.

172. Hilltop intentionally marginalized Plaintiff by assigning him menial and demeaning work inconsistent with his senior compliance role and professional experience, as part of a broader effort to isolate, degrade, and retaliate against him.

173. Hilltop knowingly blamed Plaintiff for control ownership and documentation errors while refusing to correct those errors, despite repeated notice. This deliberate misattribution of fault was extreme, unjustified, and intended to cause emotional harm.

174. Hilltop subjected Plaintiff to public humiliation by falsely blaming him for alleged delays and deficiencies in team meetings and communications, even when management knew or later acknowledged that such accusations were unfounded.

175. Following Plaintiff's complaints regarding discrimination and accommodation, Hilltop escalated public criticism, ridicule, and scapegoating, creating a pattern of humiliation that exceeded all bounds of decency tolerated in a civilized workplace.

176. Hilltop relied on demonstrably false or exaggerated performance criticisms to justify discipline, knowing such criticisms were untrue, and used them as a pretext to undermine Plaintiff professionally and emotionally.

177. Hilltop assigned Plaintiff to politically sensitive and ill-defined projects without disclosing material facts, then blamed him for exposing underlying problems, setting him up for failure and humiliation.

178. Hilltop dismissed Plaintiff's documented medical limitations, ridiculed his work methods, and ignored explicit warnings that denial of remote work would jeopardize access

to life-saving chemotherapy, conduct that constitutes extreme and outrageous behavior under Texas law. *See GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611–12 (Tex. 1999).

179. Hilltop subjected Plaintiff to humiliation, isolation, intrusive monitoring, and retaliatory discipline during a period of active cancer treatment, knowing he was physically vulnerable and dependent on continued employment to afford critical medical care.

180. Hilltop knew Plaintiff was undergoing chemotherapy and was uniquely susceptible to emotional harm yet deliberately continued its harassing and punitive conduct.

181. Hilltop engaged in targeted monitoring of Plaintiff's internal communications, calendar activity, and collaboration tools in a manner that departed from standard practices and was intended to exert psychological pressure and provoke resignation.

182. This conduct was not legitimate performance management or policy enforcement, but a calculated effort to inflict emotional distress by intimidation, surveillance, humiliation, and retaliation for protected activity.

183. Specific conduct supporting this claim includes, but is not limited to:

- Publicly mocking Plaintiff's work methods and implying cognitive decline;

- Ignoring Plaintiff's written warnings that denial of remote work would endanger access to essential chemotherapy;

- Forcing Plaintiff onto involuntary medical leave despite his expressed ability and willingness to work with accommodation; and

- Retaliatory monitoring and use of internal communications, including surveillance of job search activity and protected disclosures.

184. Hilltop deliberately ignored clear medical disclosures and accommodation requests while escalating discipline and harassment, demonstrating callous indifference to Plaintiff's medical crisis.

185. These actions were not isolated or trivial but formed a consistent, intentional pattern designed to degrade, destabilize, and emotionally harm Plaintiff over time.

186. Hilltop's refusal to provide training or onboarding, combined with sustained pressure and criticism during chemotherapy and repeated accommodation requests, constituted extreme and outrageous conduct.

187. Hilltop issued humiliating and pretextual disciplinary actions while ignoring Plaintiff's health status and accommodation needs, further contributing to the severe emotional harm inflicted.

188. Hilltop disregarded Plaintiff's repeated written communications describing acute emotional and physical distress caused by its conduct, reinforcing the outrageousness of its actions.

189. Despite explicit notice of the serious health impacts of its conduct and requests for protection from retaliation, Hilltop proceeded to discipline Plaintiff and remove him from the workplace.

190. Hilltop falsely accused Plaintiff of misconduct relating to work materials that Plaintiff reasonably preserved in connection with documenting compliance failures, an act intended to humiliate and cause severe emotional distress.

191. As a direct and proximate result of Hilltop's extreme and outrageous conduct, Plaintiff suffered severe emotional distress, including anxiety attacks, sleep disruption, loss of dignity,

emotional withdrawal, and physical manifestations that interfered with ongoing cancer treatment.

192.   Plaintiff seeks only "garden-variety" emotional distress damages such as humiliation, anxiety, and disruption of daily life and does not seek damages requiring expert psychiatric testimony.

193.   Plaintiff's claim is based solely on Hilltop's conduct and its foreseeable effects and does not rely on any preexisting condition.

194.   Hilltop Holdings, Inc. is liable for intentional infliction of emotional distress under Texas common law.

## COUNT SIX – GROSS NEGLIGENCE

195.   This Count is brought under Texas common law against Hilltop Holdings, Inc. only. Hilltop exhibited gross negligence by failing to train, supervise, intervene, or implement safeguards despite clear knowledge of Plaintiff's serious medical condition, protected status, and escalating physical and emotional distress.

196.   Under Texas law, gross negligence requires proof that:

(1) viewed objectively, the act or omission involved an extreme degree of risk, considering the probability and magnitude of potential harm; and

(2) the defendant had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, or welfare of others.

See *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994).

### A. Extreme Degree of Risk

197.    Objectively viewed, Hilltop's conduct created an extreme degree of risk of serious harm by knowingly subjecting an employee undergoing active cancer treatment to escalating workplace hostility, denial of medical accommodation, economic deprivation, and forced medical leave, despite clear warnings that loss of income would jeopardize life-sustaining treatment.

198.    Hilltop further created an extreme risk by failing to provide training, onboarding, or role clarity for complex compliance responsibilities while simultaneously increasing scrutiny, criticism, and discipline, predictably placing Plaintiff's health, livelihood, and professional standing at risk.

199.    The risk was not abstract or speculative. The foreseeable consequences included interruption of chemotherapy, severe emotional distress, financial harm, and deterioration of physical health—harms far exceeding those associated with ordinary employment disputes.

200.    **B. Subjective Awareness and Conscious Indifference**

201.    Hilltop had actual, subjective awareness of the extreme risk because it knew:

202.    Plaintiff had incurable cancer and was undergoing chemotherapy;

203.    Plaintiff explicitly warned that denial of accommodation and income would force cessation of treatment;

204.    Plaintiff repeatedly requested reasonable accommodation and assistance;

205.    Supervisors were isolating, ridiculing, and marginalizing Plaintiff based on age and disability; and

206.    Plaintiff was experiencing escalating distress directly tied to workplace conduct.

207.    Despite this knowledge, Hilltop acted with conscious indifference by failing to take corrective action and by:

- Failing to train or supervise HR personnel and managers on the ADA interactive process;

- Ignoring urgent written warnings regarding the medical consequences of denying accommodation;

- Refusing to intervene when supervisors conveyed ridicule, isolation, and hostile treatment;

- Denying all reasonable accommodations, including secure remote work that was technically feasible and previously permitted; and

- Forcing Plaintiff onto involuntary medical leave during a critical phase of cancer treatment, despite his stated ability and willingness to work.

208.    Hilltop's failure to provide training or support, while simultaneously increasing pressure and criticism during chemotherapy and repeated accommodation requests—demonstrates more than poor judgment. It reflects a deliberate choice to proceed in the face of known, life-threatening risk.

209.    Hilltop's conduct was systemic, repeated, and managerial in nature, reflecting organizational indifference rather than isolated supervisory error.

**C. Resulting Harm**

210.    This course of conduct goes beyond ordinary negligence. Hilltop knowingly placed Plaintiff's life, health, and federally protected rights at extreme and unnecessary risk.

211.    As a direct and proximate result of Hilltop's gross negligence, Plaintiff suffered disruption of medical care, severe emotional distress, financial harm, and damage to his professional reputation.

212.    Hilltop Holdings, Inc. is therefore liable for gross negligence under Texas common law, including liability for exemplary damages as permitted by law.

## COUNT SEVEN – CONSTRUCTIVE DISCHARGE

### (Under Federal and Texas Law)

213.    This Count is brought under federal employment discrimination statutes, including the Americans with Disabilities Act (ADA), the Age Discrimination in Employment Act (ADEA), as well as under Texas law.

214.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

215.    Defendant created and maintained a working environment that was hostile, retaliatory, degrading, and medically unsafe, such that a reasonable person in Plaintiff's position would have felt compelled to resign.

216.    Defendant subjected Plaintiff to a sustained pattern of demeaning assignments, unjustified scrutiny, exclusion from meetings, and escalating discipline that stripped his role of dignity and rendered continued employment untenable.

217.    Plaintiff repeatedly sought internal resolution through good-faith complaints, requests for accommodation, and engagement with Human Resources, demonstrating his desire to remain employed rather than resign.

218.    Rather than addressing these concerns, Defendant allowed conditions to worsen, denying support, training, or accommodation while increasing pressure and criticism in high-risk compliance areas.

219.    Defendant's conduct included persistent age-based and disability-based ridicule, patronizing language, and disparagement of Plaintiff's work methods, reinforcing an atmosphere of humiliation and marginalization.

220. Plaintiff was subjected to retaliation for protected activity, including exclusion from meetings and communications, unjustified disciplinary actions, and the creation of pretextual performance records.

221. Defendant refused to engage in the ADA-required interactive process despite repeated requests and clear notice of Plaintiff's medical condition and need for accommodation.

222. Defendant denied reasonable accommodations, including remote work that was technically feasible and previously permitted, even after Plaintiff explained that continued income was necessary to maintain life-sustaining cancer treatment.

223. Defendant coercively placed Plaintiff on involuntary medical leave against his will, despite his expressed ability and desire to continue working with accommodation.

224. Defendant constructed disciplinary files based on misrepresentations and selectively enforced expectations, while ignoring Plaintiff's prior successful work and legitimate concerns about compliance deficiencies.

225. Defendant engaged in targeted, non-routine monitoring of Plaintiff's internal communications, work activity, and job search efforts, creating an atmosphere of intimidation intended to punish protected complaints.

226. Even after Plaintiff raised serious concerns directly with senior leadership and Human Resources, Defendant failed to intervene or remediate the hostile conditions, allowing retaliation and isolation to intensify.

227. Defendant ignored clear medical documentation and repeated warnings that denial of accommodation and forced leave would endanger Plaintiff's health, using his disclosures against him rather than offering support.

228. Defendant's conduct occurred against the backdrop of known compliance failures that Plaintiff identified in good faith. Rather than correcting those deficiencies, Defendant scapegoated Plaintiff, increasing hostility and pressure.

229. The issuance of a final written warning based on pretextual allegations further signaled that Defendant had predetermined Plaintiff's removal rather than any intent to rehabilitate or accommodate him.

230. Plaintiff continued to engage Human Resources in good faith, requesting accommodation and protection from retaliation, only to have his requests ignored and adverse actions escalate.

231. Under federal law, constructive discharge constitutes an adverse employment action when working conditions become so intolerable that a reasonable person would feel compelled to resign. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004).

232. The Fifth Circuit recognizes that persistent harassment, demeaning assignments, and retaliatory conduct, each present here, can support a finding of constructive discharge. *See Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994).

233. Under Texas law, constructive discharge is actionable where an employee resigns due to working conditions so intolerable that no reasonable person would remain. *See Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997).

234. Plaintiff's constructive discharge caused substantial harm, including severe emotional distress, interruption of medical treatment, reputational damage, and significant financial loss.

235. Defendant knew Plaintiff was undergoing active cancer treatment and that denying accommodation and forcing involuntary leave would disrupt critical care and cause serious harm yet proceeded with conscious indifference.

236. The necessity of repeated external complaints underscores the intolerable conditions Defendant created and confirms that Plaintiff did not resign voluntarily but was forced out by Defendants conduct.

237. Defendant's final actions, including false accusations of misconduct and public humiliation, exemplified the retaliatory and degrading environment that made continued employment impossible.

238. Plaintiff therefore suffered a constructive discharge as a direct and proximate result of Defendant's unlawful conduct.

239. Plaintiff seeks all remedies available under federal and Texas law, including back pay, front pay, compensatory damages, punitive damages where permitted, declaratory, and injunctive relief, and all other relief this Court deems just and appropriate.

## COUNT EIGHT – FAILURE TO ACCOMMODATE

### (ADA and Texas Labor Code § 21.128(a))

240. This Count is brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and Texas Labor Code § 21.128(a), which require employers to provide reasonable accommodations to qualified individuals with disabilities.

241. Plaintiff has multiple qualifying disabilities, including monocular vision, severe gastrointestinal illness, and incurable cancer requiring ongoing chemotherapy. These disabilities substantially limit one or more major life activities and were known to Defendant.

242. Plaintiff was a qualified individual who could perform the essential functions of his position with reasonable accommodation.

243. Reasonable accommodations available to Defendant included flexible scheduling, remote work, and continued work access during medical treatment—options that were technically feasible and consistent with company practice.

244. Plaintiff repeatedly and clearly requested reasonable accommodations, including remote work and flexibility during chemotherapy, and expressly confirmed his willingness and ability to continue working.

245. Defendant failed to engage in the ADA-required interactive process and instead refused or delayed accommodations without justification.

246. Rather than explore or implement effective accommodations, Defendant unilaterally forced Plaintiff onto involuntary medical leave despite his expressed objection and ability to work.

247. Defendant had a statutory duty to engage in good-faith discussions to identify appropriate accommodations but deliberately chose not to do so.

248. Defendant improperly demanded additional medical documentation as a barrier to accommodation, despite prior disclosures and clear notice of Plaintiff's disabilities.

249. Even after receiving further medical confirmation, Defendant continued to delay, restrict, or deny accommodation and falsely claimed uncertainty regarding Plaintiff's medical condition to justify adverse action.

250. Defendant's insistence on treating accommodation as temporary or discretionary—rather than a legal obligation—demonstrates bad faith and a failure to comply with the ADA.

251. Plaintiff repeatedly reaffirmed his ability to perform his job duties with accommodation, yet Defendant refused to consider alternatives or engage in meaningful dialogue.

252. Texas law independently prohibits failure to accommodate a known disability. *See* Tex. Lab. Code § 21.128(a).

253. Defendant's failure to accommodate was intentional, knowing, and in reckless disregard of Plaintiff's federally and state-protected rights.

254. As a direct and proximate result of Defendant's unlawful failure to accommodate, Plaintiff suffered medical jeopardy, emotional distress, loss of income, and economic harm.

255. Plaintiff seeks all relief available under federal and Texas law, including compensatory damages, injunctive and declaratory relief, and any other relief the Court deems just and appropriate.

## COUNT NINE – INTERFERENCE WITH FMLA RIGHTS

### (Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.)

256. This Count is brought under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., which prohibits employers from interfering with, restraining, or denying the exercise of FMLA rights.

257. Plaintiff was eligible for FMLA protections but did not request FMLA leave.

258. Instead, Defendant unilaterally placed Plaintiff on FMLA leave over his express objections, despite Plaintiff's clear and repeated statements that he was able and willing to continue working with reasonable accommodations.

259. Plaintiff specifically sought to remain working during medical treatment and proposed alternative arrangements that would have allowed him to perform his job duties while undergoing chemotherapy.

260.  As a senior, salaried, exempt employee, Plaintiff had discretion over work hours and work location, and his proposed arrangements were consistent with his role, past practice, and company policies permitting remote work.

261.  Defendant imposed FMLA leave without medical necessity, without Plaintiff's consent, and without engaging in any meaningful discussion regarding alternatives that would have allowed Plaintiff to continue working.

262.  Forcing an employee onto involuntary leave, rather than permitting continued work, constitutes unlawful interference with FMLA rights under 29 U.S.C. § 2615(a)(1).

263.  Defendant further interfered with Plaintiff's rights by requiring exhaustion of paid time off as a condition of continued employment, thereby depriving Plaintiff of wages and benefits protected by the FMLA.

264.  Plaintiff repeatedly informed Defendant that continued income was necessary to afford ongoing chemotherapy treatment and that forced leave would place his health and medical care in jeopardy.

265.  Despite this notice, Defendant failed to respond, failed to intervene, and failed to consider any alternative arrangements that would have preserved Plaintiff's employment and medical stability.

266.  Defendant's conduct interfered with Plaintiff's statutory right to choose whether and when to take FMLA leave and improperly converted a medical protection statute into a mechanism for exclusion and retaliation.

267.  Defendant's actions also constituted retaliation under the FMLA for Plaintiff's opposition to forced leave and for asserting rights protected by the ADA and related employment statutes.

268. As a direct and proximate result of Defendant's unlawful interference, Plaintiff suffered lost wages, loss of benefits, medical jeopardy, emotional distress, and economic harm.

269. Plaintiff seeks all legal and equitable relief available under the FMLA, including lost compensation, liquidated damages, injunctive relief, declaratory relief, and such other relief as the Court deems just and proper.

### COUNT TEN – INTRUSION UPON SECLUSION

### (Texas Common Law Tort)

270. This Count is brought under Texas common law, which recognizes intrusion upon seclusion as a tort where a defendant intentionally intrudes, physically or otherwise, upon another's private affairs in a manner that would be highly offensive to a reasonable person.

271. After Plaintiff engaged in protected activity, including internal complaints, requests for reasonable accommodation, and reports of compliance deficiencies, Defendant intentionally subjected Plaintiff to heightened, targeted surveillance that exceeded any legitimate business purpose.

272. This conduct included, among other actions, the targeted review of Plaintiff's electronic communications, calendar activity, and internal messaging in a manner that was not routine, uniform, or tied to ordinary performance management or IT security practices.

273. The surveillance was focused on Plaintiff personally, escalated only after his protected activity, and was conducted in a manner designed to monitor his legal complaints, accommodation requests, and whistleblower-related activity rather than legitimate business operations.

274. Plaintiff had a reasonable expectation of privacy in personal and sensitive matters accessed through this surveillance, including medical-related communications, draft legal

materials, and communications relating to protected activity that were not part of his ordinary job duties.

275. Plaintiff did not consent to this level or purpose of monitoring, and Defendant provided no notice that his communications or activity would be reviewed in a retaliatory or investigative manner unrelated to legitimate business needs.

276. Defendant's conduct constituted an intentional intrusion into Plaintiff's private affairs that would be highly offensive to a reasonable person, particularly given the timing, scope, and retaliatory nature of the surveillance.

277. Texas law recognizes intrusion upon seclusion where an employer's access to workplace systems is used in an excessive or abusive manner to monitor private or protected matters unrelated to legitimate business purposes. See *Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex. 1973).

278. Although employers may maintain general oversight of company systems, Texas law does not permit the use of such access as a tool to intimidate, retaliate against, or surveil an employee for engaging in protected legal activity.

279. Defendant's conduct went beyond ordinary workplace monitoring and constituted a deliberate invasion of Plaintiff's privacy, dignity, and autonomy.

280. As a direct and proximate result of Defendant's intrusion upon Plaintiff's seclusion, Plaintiff suffered emotional distress, anxiety, loss of privacy, and harm to his sense of personal security.

281. Plaintiff seeks compensatory damages, exemplary damages where permitted by law, and all other relief to which he may be entitled.

## COUNT ELEVEN – SOX WHISTLEBLOWER RETALIATION

### (18 U.S.C. § 1514A)

282. This Count is brought under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, which prohibits publicly traded companies from retaliating against an employee for providing information or assisting in an investigation regarding conduct the employee reasonably believes constitutes a violation of federal securities laws, SEC rules or regulations, or federal laws relating to fraud against shareholders.

283. Plaintiff engaged in protected activity by raising concerns, in good faith and with a reasonable belief, regarding materially inaccurate SOX control documentation, the integrity of quarterly control certifications, and deficiencies in internal control processes subject to SEC and PCAOB oversight.

284. Plaintiff's disclosures concerned matters that he reasonably believed could result in misleading financial reporting, inaccurate internal controls over financial reporting ("ICFR"), or violations of SEC rules governing public company disclosures. These disclosures fall squarely within the scope of protected activity under 18 U.S.C. § 1514A.

285. Plaintiff communicated these concerns internally to supervisors, internal audit leadership, and senior management responsible for SOX compliance and financial reporting. Defendant was aware of Plaintiff's protected disclosures and understood that they implicated SEC-regulated compliance obligations.

286. Shortly after Plaintiff made these protected disclosures—and because of them—Defendant subjected Plaintiff to adverse personnel actions, including exclusion from meetings, denial of access to systems and information necessary to perform his role,

pretextual disciplinary actions, heightened scrutiny, and actions that culminated in constructive discharge.

287. Plaintiff's protected activity was a contributing factor in Defendant's decision to take these adverse actions. The close temporal proximity between Plaintiff's disclosures and the escalation of discipline, exclusion, and adverse treatment supports an inference of retaliatory motive.

288. Plaintiff further reported SOX-related concerns to federal regulators, including OSHA and the Securities and Exchange Commission. These regulatory filings are ongoing and concern the same compliance failures Plaintiff raised internally.

289. Defendant Hilltop Holdings Inc. is a publicly traded company subject to the Sarbanes-Oxley Act. Plaintiff was an employee engaged in protected whistleblower activity within the meaning of 18 U.S.C. § 1514A.

290. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered economic harm, reputational damage, emotional distress, and loss of employment.

291. Plaintiff seeks all relief available under 18 U.S.C. § 1514A, including back pay, front pay, compensatory damages, litigation costs, and such other relief as the Court deems just and proper. Plaintiff does not seek reinstatement.

## COUNT TWELVE – DECLARATORY RELIEF

### (28 U.S.C. § 2201 and Texas Civil Practice & Remedies Code § 37.001 et seq.)

292. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

293. An actual, substantial, and justiciable controversy exists between Plaintiff and Defendant concerning Plaintiff's statutory and common-law rights and Defendant's legal obligations arising from the conduct described in this Complaint.

294. Plaintiff contends that Defendant violated his rights under the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), the Family and Medical Leave Act ("FMLA"), the Sarbanes-Oxley Act ("SOX"), Chapter 21 of the Texas Labor Code, and applicable Texas common law.

295. Defendant denies liability, asserts that their conduct was lawful, and continues to maintain positions that adversely affect Plaintiff's legal rights and interests, thereby creating an ongoing controversy appropriate for declaratory relief.

296. Plaintiff therefore seeks a declaration pursuant to 28 U.S.C. § 2201 that:

- **Defendant's conduct constituted unlawful disability discrimination** in violation of the ADA and Texas Labor Code Chapter 21;

- **Defendant's conduct constituted unlawful age discrimination** in violation of the ADEA and Texas Labor Code Chapter 21;

- **Defendant failed to engage in the ADA-required interactive process and denied reasonable accommodations** in violation of federal and Texas law;

- **Defendant interfered with and retaliated against Plaintiff** in violation of the FMLA;

- **Defendant retaliated against Plaintiff for protected whistleblower activity** in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A;

- **Defendant's conduct created a hostile work environment and resulted in constructive discharge** under federal and Texas law; and

- **Defendant violated Texas common law** by engaging in gross negligence, intrusion upon seclusion, and intentional infliction of emotional distress.

297.    A declaratory judgment will clarify and settle the legal relations between the parties, resolve uncertainty regarding Plaintiff's rights and Defendant's obligations, and serve a useful purpose in guiding future conduct and preventing continued or future harm.

298.    Plaintiff further seeks declaratory relief under the Texas Declaratory Judgments Act, Texas Civil Practice & Remedies Code § 37.001 et seq., to the extent state law remedies apply.

### VI. DAMAGES AND PRAYER FOR RELIEF

299.    As a direct and proximate result of Defendant's unlawful conduct, including discrimination, retaliation, failure to accommodate, intrusion upon privacy, interference with statutory rights, and constructive discharge, Plaintiff has suffered and continues to suffer substantial harm. This harm includes lost compensation and benefits, disruption of critical medical treatment, damage to professional reputation, and severe emotional distress.

300.    Defendant's conduct was intentional, coordinated, and carried out with knowledge of Plaintiff's protected status, medical vulnerability, and legal rights. Their actions foreseeably caused economic, physical, and emotional harm for which relief is warranted under federal and Texas law.

301.    Plaintiff seeks the following categories of damages and relief, expressly reserving the right to amend or supplement these categories and amounts based on discovery, expert analysis, and trial evidence:

- **Back Pay and Lost Wages:**

  Compensation for lost salary, bonuses, retirement contributions, benefits, and other

employment-related compensation resulting from Defendant's actions, including forced unpaid leave and constructive discharge.

- **Front Pay / Future Earnings:**

  Compensation for future lost earnings and diminished earning capacity resulting from the long-term impact of Defendant's conduct on Plaintiff's career, employability, and professional standing.

- **Medical and Health-Related Damages:**

  Economic and consequential damages arising from disruption of medical treatment, loss of income and benefits necessary to maintain care, and increased health risks caused by Defendant's refusal to accommodate known disabilities and forced unpaid leave.

- **Emotional Distress Damages:**

  Compensation for mental anguish, humiliation, anxiety, loss of dignity, and emotional suffering caused by Defendant's conduct, without waiver of applicable privacy or evidentiary protections.

- **Punitive and Exemplary Damages:**

  Where permitted by law, Plaintiff seeks punitive and exemplary damages to punish and deter willful, malicious, retaliatory, or grossly negligent conduct. See Tex. Civ. Prac. & Rem. Code § 41.003(a).

302. **Attorneys' Fees and Costs:**

Plaintiff seeks reasonable attorneys' fees, expert witness fees, and litigation costs as authorized by applicable federal and state statutes, including but not limited to 42 U.S.C. §§ 1988, 2000e-5(k), 12117, and 29 U.S.C. § 2617.

303. **Tax Gross-Up:**

To the extent any portion of Plaintiff's recovery is subject to adverse tax consequences, Plaintiff seeks an equitable tax gross-up to fully compensate him for losses caused by Defendant's unlawful conduct.

304. **Equitable, Declaratory, and Injunctive Relief:**

Plaintiff seeks all appropriate equitable relief, including but not limited to:

305. Expungement of negative or fabricated personnel records;

306. Injunctive relief prohibiting further retaliation, surveillance, or interference with protected rights;

307. Declaratory relief confirming Defendant's violations of federal and Texas law; and

308. Such other relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant, and award the following relief:

- Compensatory Damages for back pay, front pay, lost benefits, emotional distress, medical harm, and all other economic and non-economic losses, in amounts to be determined at trial;

- Punitive and Exemplary Damages against Hilltop Holdings Inc. and any individual Defendant found to have acted with malice, gross negligence, reckless indifference, or as part of unlawful retaliatory or discriminatory conduct, as permitted by law;

- Equitable and Injunctive Relief, including but not limited to:

- o Expungement of adverse, retaliatory, or fabricated employment records;

- o An order enjoining Defendant from engaging in further retaliation, surveillance, or interference with Plaintiff's statutory and common-law rights;

- Declaratory Relief declaring that Defendant's conduct violated Plaintiff's rights under the ADA, ADEA, FMLA, the Texas Labor Code, and Texas common law;

- Attorneys' Fees, Expert Witness Fees, and Costs of Court as permitted under 42 U.S.C. §§ 1988, 2000e-5(k), 12117, 29 U.S.C. § 2617, and other applicable statutes;

- Pre-Judgment and Post-Judgment Interest as allowed by law;

- Tax Gross-Up Relief for any damages determined to be taxable, to ensure full restoration of Plaintiff's economic losses caused by Defendant's unlawful conduct; and

- Such other and further relief, legal or equitable, as the Court may deem just and proper.

Respectfully submitted,
/s/ John Hurt
John Hurt, Pro Se
3868 Wintergreen Drive
Plano, Texas 75074
mustang4021@gmail.com
585-289-4599

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026 I served a true and correct copy of the foregoing

document entitled "Plaintiff's Complaint" on counsel for Defendant as follows:

Talley R. Parker
Jackson Lewis P.C.
500 N. Akard Street, Suite 2500
Dallas, Texas 75201
talley.parker@jacksonlewis.com

Respectfully submitted,
/s/ John Hurt
John Hurt, Pro Se
3868 Wintergreen Drive
Plano, Texas 75074
mustang4021@gmail.com